IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PRADEEP DIXIT                          :
                                       :
v.                                     :   Civil No. WMN-03-3346
                                       :
NEW BOARD OF SCHOOL                    :
COMMISSIONERS OF THE BALTIMORE         :
CITY SCHOOL SYSTEM                     :


<u>MEMORANDUM</u>

Before the Court is Defendant Baltimore City Board of School Commissioners' (BCBSC) motion for summary judgment.  Paper No. 34.  That motion is ripe for decision.  Upon a review of the motion and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and the motion will be granted.

<u>I.  FACTUAL AND PROCEDURAL BACKGROUND</u>

Plaintiff Pradeep "Pete" Dixit was employed by Defendant from 1976 until his termination on March 14, 2003.  At the time of his termination Plaintiff served as Defendant's Director of Facilities for BCBSC.  In July 2001, Plaintiff began reporting to Defendant's new Chief Operating Officer (COO) Mark Smolarz.  In the fall of 2001, Smolarz approved a $4,000 performance bonus and a retroactive pay raise for Plaintiff.  Dixit Dep. 130-31.  In November 2002, Plaintiff received a memorandum entitled "Performance Evaluation Feedback."  <u>Id.</u> 131.  The document set forth Smolarz's concerns over the work performance of Plaintiff

in reference to three specific matters.[1]  Compl., Ex. 3.
Plaintiff admits receipt of the document but despite its title
and the information it contained, he denies that it was a
performance evaluation.  Dixit Dep. 130-31.

In the early 1990's, a number of Baltimore City public
schools were identified as having high levels of lead in their
water.  Dixit Dep., Ex. 22.  BCBSC hired an engineering firm to
test the schools' water for lead (Dixit Dep., Ex. 18) and the
lead levels of many of the schools exceeded the EPA safety
standard.  Dixit Dep., Ex. 21.  The firm issued a report
identifying the water fountains with high lead levels that needed
to be disabled until corrected.  Dixit Dep., Ex. 18.  Ten years
later, in August 2002, Ruth Ann Norton, the Executive Director of
the Coalition to End Childhood Lead Poisoning, contacted
Defendant's Chief Executive Officer (CEO) Carmen Russo,
expressing her concerns about the elevated lead levels in the
schools' drinking fountains.  Dixit Dep., Ex. 10.  On March 8,
2003, after increased public concern surrounding the lead-in-
water problem, the Health Department began issuing citations to
city schools that were not in compliance with a February 26,
2003, Baltimore City Health Commission notice that mandated
public schools to disable all drinking fountains and replace each

---

[1]  The three issues discussed by Smolarz concerned the
Plaintiff's failure to (1) follow-up on the safety of boilers
after an explosion occurring one year earlier, (2) notify Smolarz
of the State's annual inspection of school facilities, and (3)
resolve problems the school's officials and staff had brought to
Plaintiff's attention.  Compl., Ex. 3.

disabled fountain with a bottled water station and post "hand washing only-do not drink" signs in all school lavatories.  Dixit Dep. 115-117. In March 2003, Mark Smolarz, Chief Operating Officer (COO) of the Baltimore City Public School System, terminated Plaintiff (East Indian decent) and the Health and Safety Officer of BCBSC, Jack Elam (African American), from their employment with the school system.  In their letters of termination COO Smolarz stated that the terminations were in response to their inadequate handling of the lead-in-water crisis.  Compl., Ex. 5; Dixit Dep., Ex. 28.  Plaintiff was replaced by Darryl Williford (African American) and Elam was replaced by Dr. Sayid Rahimi (Iranian).  Reginald Lawrence Aff. ¶¶ 4-5.

On August 14, 2003, Plaintiff filed a charge of Discrimination based on race (East Asian), national origin (Indian), and age (now 58) with the Equal Employment Opportunity Commission (EEOC).  On August 29, 2003, the EEOC issued Plaintiff a right to sue letter.  Plaintiff then filed suit in this Court on November 21, 2003,[2] and amended his complaint on April 27, 2004.  On November 29, 2004, this Court granted Defendant's motion for partial dismissal of the amended complaint.  Paper No. 23.  The only counts remaining are Plaintiff's Title VII disparate treatment claims as they relate to Plaintiff's

---

[2] Plaintiff alleged race, national origin, and age discrimination in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and 42 U.S.C. § 1981.

termination based upon his race and national origin.  Defendant now moves for summary judgment as to Plaintiff's remaining counts.

## II.  LEGAL STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates that a triable issue of fact exists for trial.  Celotex, 477 U.S. at 324.  Unsupported

speculation is insufficient to defeat a motion for summary judgment. <u>Felty</u>, 818 F.2d at 1128 (<u>citing</u> <u>Ash v. United Parcel Serv., Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986)). Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." <u>Id.</u>

## III. DISCUSSION

Discrimination under Title VII can be established in two ways, through direct proof of discriminatory intent, <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111 (1985), or through indirect proof under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Plaintiff offers no direct proof of race or national origin discrimination.[3]

---

[3] Although Plaintiff contends that months before his termination CEO Russo told Jimmie Jones, a school principal, of her desire to get rid of Plaintiff (Plaintiff Interrog. 3), in his affidavit, Jones states that he never had a conversation with CEO Russo concerning Plaintiff. Jones Aff. ¶¶ 3-4. This is not a dispute of material fact because even if such a statement was made it does not reflect a discriminatory intent. Plaintiff also contends that COO Smolarz told architect Stanley Crain that he was going to get the "son of a bitch" Dixit. Dixit Interrog. 3. In his affidavit Crain denies making such a statement or telling Plaintiff that such a statement was ever made. Crain Aff. ¶¶ 4-5. Again, this is not a dispute of material fact because even if the statement was made it does not reflect a discriminatory intent. <u>See</u> <u>Hopkins v. Baltimore Gas & Electric Co.</u>, 77 F.3d 745, 754 (4th Cir. 1996) (holding that "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace").

Plaintiff has failed to establish a prima facie case of discriminatory discharge under the McDonnell Douglas burden shifting framework used to prove intentional discrimination through indirect evidence.  In order to establish a prima facie case of racial discrimination under Title VII the Plaintiff must show that 1) he is a member of the protected class, 2) his job performance was satisfactory, 3) in spite of his performance, he was fired, and that 4) following his discharge, someone outside the protected class replaced Plaintiff.  White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).  It is not disputed that Plaintiff meets three of these requirements:  he is of East Indian decent and is a member of a protected class, he was discharged, and was replaced by an African American, someone outside the protected class.  Drawing all reasonable inferences in favor of the Plaintiff, the Court cannot reasonably conclude that the Plaintiff was performing his job satisfactorily at the time of his termination.

Plaintiff supports his argument that at the time of his termination he was performing his job satisfactorily solely with his own testimony.  Plaintiff does not contend that he adequately responded to the lead-in-water problem, but rather he asserts that the problem was not his responsibility.[4]  Unsupported

---

[4] Plaintiff attempts to support his argument that he performed his work satisfactorily with the Deposition of Dr. Jeffery Grotsky, who was a member of the facilities committee

speculation is insufficient to defeat a motion for summary

judgment.  <u>Felty</u>, 818 F.2d at 1129.  Even though it is entitled

"Performance Evaluation Feedback" Plaintiff denies that his

negative performance evaluation from November 8, 2002, was a

performance evaluation.  Dixit Dep. 130-131.   The first

paragraph of the document states:

> The purpose of this memo is to share with you
> several concerns the Board, the CEO and I have in
> your work performance.  Specifically, there have
> been several occasions where you have failed to
> follow through on significant issues, to
> communicate vital information to me and to follow
> up on concerns and/or issues raised by other BCPSS
> staff.  Further, it is expected that this memo
> will aid you in addressing these concerns.

Compl., Ex. 3.  The memorandum further discusses the Defendant's

concerns surrounding three specific issues.  Regardless of what

the document is labeled, it clearly reflects the non-satisfactory

nature of Plaintiff's job performance.  Plaintiff's bald

assertion that his work was satisfactory is insufficient to

establish prong two of the prima facie case.

In addition to the negative performance evaluation,

Defendant contends that the main impetus for Plaintiff's

---

from 2001 to 2003.  Grotsky Dep. 5-6.  Dr. Grotsky stated that
his individual interactions with Plaintiff were "very positive"
and "very good."  Grotsky Dep. 9.  Dr. Grotsky, however, does not
speak to Plaintiff's handling of the lead-in-water situation and
does not at all refute Defendant's argument that the situation
was inadequately handled by Plaintiff.  In addition, Plaintiff
attempts to use the Affidavit of John Green, the Director of
Facilities in the mid-1990's, to show that his work was
satisfactory.  Green Aff. ¶ 1.  Although Green does state that
Dixit received outstanding evaluations during the 1990's, the
statements of Green do not at all reflect on Plaintiff's work
product during the time of his termination.

7

termination was his failure to adequately address the lead-in-water problem faced by the school system.  Smolarz Dep. 68-69. Plaintiff does not deny that there was a problem with lead in the drinking water of the school system, nor does he deny that the problem was not adequately addressed.  In fact, Plaintiff agrees that some employees, in particular he mentions COO Smolarz, should have been penalized for the school's failure to respond to the lead-in-water problem.  Dixit Dep. 127, 129.  While admitting that there was a lead-in-water problem and that it was mishandled, Plaintiff simply asserts that "he was not in any way involved in finding a resolution . . .  [to the] lead in water" problem.  Dixit Dep. 77-78.

At the time of the lead-in-water crisis, the executives above Plaintiff all certainly believed that it was part of Plaintiff's job responsibility to handle the problem.  Smolarz Depo. 68-69.  In a September 10, 2002, letter CEO Russo told Norton that Plaintiff would be addressing her concerns about the alleged elevated lead levels in the school system's water fountains and that if she had further concerns she should contact Plaintiff.  Dixit Dep., Ex. 10.  In an October 21, 2002, memorandum CEO Russo informed academic officers and principles that the Department of Facilities "is the primary responder for all concerns regarding water quality issues" and that the department would be determining the number of bottled water fountains placed in each school.  Dixit Dep., Ex. 11.  In addition, Joanne Dull, a representative of the Baltimore City

Health Department, stated that she believed Dixit and Elam were the two representatives of the school system dealing with the lead-in-water problem.  Dull Dep. 22, 25-26.

Furthermore, Plaintiff's position that he was not responsible for dealing with the lead water problem is untenable and unreasonable in light of the actions taken by Plaintiff during the lead water crisis.  According to the Agendas for Facilities and Capital Budget Committee meetings held on September 23, 2002, and January 27, 2003, Plaintiff was the speaker that discussed lead-in-water.  Dixit Dep., Exs. 15, 16. The minutes from the January 27, 2003, Facilities and Capital Budget Committee meeting, show that Plaintiff and Elam addressed the committee in reference to the lead-in-water problem.  Dixit Dep., Ex. 2.  At that meeting,

> [Plaintiff] attempted to clarify two particular concerns regarding the lead-in-water presentation: 1) where water does not exist, or 2) where there are insufficient drinking fountains. [Plaintiff] further stated that <u>Facilities staff</u> is presently determining the number of water fountains, the number of needed water coolers, and where they should be placed in all schools. [Plaintiff] indicated that between 14-150 schools may require bottled water; the department will provide additional fountains in remaining schools.

<u>Id.</u> (emphasis added).  It is remarkable that Plaintiff now argues that he was not responsible for the lead-in-water problem when he, as Director of Facilities, explicitly described to the school board committee how <u>facilities staff</u> was addressing the lead-in-water problem.  <u>Id.</u>  In a

9

subsequent meeting of the same committee held on February
24, 2003, Plaintiff and Elam gave a presentation on the
lead-in-water problems, they discussed the history of the
crisis and their strategy for remedying the lead problem.
Dixit Dep., Ex. 17.  In addition, to the facility committee
meetings, Plaintiff meet with COO Smolarz and Elam to
discuss how to address the lead-in-water issue.  Dixit Aff.
¶ 16.  Plaintiff also attended a number of other meetings to
discuss the lead-in-water problem, including meetings at the
Baltimore City Health Department.  Dixit Aff. ¶ 19; Dixit
Dep. 106; Elam Dep. 24.

Plaintiff also sent a number of letters illustrating
his involvement in and responsibility for resolving the
lead-in-water problem.  On November 4, 2002, Plaintiff sent
a letter to a company that did water testing requesting an
assessment of lead in the water; the same company had done
an assessment of the school system's water in 1992.  Dixit
Dep., Ex. 12.  Also Plaintiff responded to the CEO of the
Coalition to End Childhood Lead Poisoning on November 4,
2002, stating that, "I look forward to working with you and
your staff in reducing the exposure to our children to the
hazards of lead. . . .  I hope that I will be able to call
on your organization to assist with intervention strategies
as we move forward in our process." Dixit Dep., Ex. 13.
Plaintiff wrote another letter to Ronald Cuffie, the
Assistant Commissioner of the Division of Environmental

Health, on January 10, 2003.  Dixit Dep., Ex. 14.  The
subject of the letter was "BCPSS Lead in Water Issues" and
in the text of the letter Plaintiff noted a number of
procedures that were "implemented to reduce the exposure to
the elevated lead levels in drinking water fountains."
Dixit Dep., Ex. 14.  He also discussed the proposal to
conduct a project to sample fountains for elevated lead-in-
water at the schools' facilities, and provided his contact
information in case any additional information was desired.
Dixit Dep., Ex. 14.

     In explaining how Plaintiff could have taken the above
actions and still argue that he had no responsibility over
the lead-in-water problem, Plaintiff asserts that in all of
the above situations he merely did what he was told to do by
his superiors and that he was just trying to help Elam.
Dixit Dep. 85-100.  There is no evidence that Plaintiff ever
objected to handling lead-in-water problems or disclaimed
responsibility for the problems prior to filing this suit.
During the facility committee meetings Plaintiff did not
disclaim responsibility when criticized by the board members
for his inaction,[5] and the only reason he offers for not
doing such is that he was not asked.  Dixit Dep. 111.  When
asked why he did not correct his superiors understanding

---

     [5] During the February 24, 2003 committee meeting, Dull
expressed her frustration with the facility management team for
constantly missing deadlines and being unable to resolve the
lead-in-water problem.  Dixit Dep., Ex. 19.

that he was responsible for lead-in-water issues, he stated
that "he knew they were discriminating against [him] and
[he] had no authority to correct their action."  Dixit Dep.
55.

There is no dispute that Elam, as director of health
and safety, was responsible for handling the lead-in-water
issues.  There is a dispute, however, as to whether Elam
reported to Dixit.  Plaintiff and Elam both contend that
Elam did not report directly to Plaintiff, but reported to
COO Smolarz.  Dixit Dep. 52, 65-69; Elam Dep. 10.  COO
Smolarz, however, states that Elam reported directly to
Dixit.  Smolarz Dep. 41.  At a February 2002 Facilities and
Capital Budget Meeting, COO Smolarz presented the committee
with a revised organizational matrix depicting facilities
management.  He stated that Plaintiff "directs facilities
management, which encompasses . . . health and safety, and
custodial operations/grounds maintenance services."  Dixit
Dep., Ex. 4.

Although it is unclear as to where the health and
safety department fits into the organizational structure of
the school system, and to whom Elam reported, Dixit Dep. 52,
54; Elam Dep. 9-10, 43, 101-102, these facts are ultimately
immaterial.  No matter whom Elam reported to, it is
undisputed that Plaintiff and Elam worked together on the
lead-in-water issue.  Elam Dep. 64.  Although Plaintiff
claims that Elam "was a one-man band," Dixit Dep. 55, it is

not disputed that the two "consulted" on the lead issues,
and Plaintiff gave suggestions to Elam as to how to handle
the problems.  Elam Dep. 44-45.  Because lead-in-water was a
"facilities related problem," Elam copied Plaintiff on all
lead-in-water correspondence, and Plaintiff and Elam had
one-on-one meetings to discuss the various issues pertaining
to the lead problem.  Elam Dep. 58, 60.  Plaintiff does not
deny such interaction with Elam.

In his deposition, Plaintiff attempts to refute the
Defendant's assertion that the lead-in-water problem was a
responsibility of the Facilities Management team, by arguing
that the problem was not delegated to any department since
there were no funds available to deal with the crisis.
Dixit Dep. 73-76.  Plaintiff does not offer any evidence to
support this position, and the inconsistency of the
statement is further illustrated by Plaintiff's statement
later on in his deposition that, "we [the facilities
department] were already turning all the fountains [off] and
putting water coolers in the room" in response to the lead
water problem.  Dixit Dep. 110-111.

Plaintiff has offered no evidence, other than his own
testimony, that he, as the Director of Facilities, was not
responsible for the lead-in-water problems.  As evidenced by
his previously discussed actions, it is clear that he
handled and was responsible, even if only partly
responsible, for the lead-in-water problem.  Therefore,
because Plaintiff has failed to show that he was performing

13

his job satisfactorily, he has failed to establish any inference of race discrimination under the McDonnell Douglas test.  Plaintiff has not established a prima facie case of discriminatory discharge based on race or national origin, and Defendant's motion for Summary Judgment will be granted.

Assuming that Plaintiff did establish a prima facie case of discrimination, Defendant has provided a legitimate non-discriminatory basis for Plaintiff's termination.  An employer's demonstration of a legitimate, non-discriminatory reason for the employee's discharge may rebut a plaintiff's prima facie case of discrimination.  Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989). Defendant's reason for Plaintiff's termination - his failure to adequately respond to the lead-in-water crisis - serves as such a legitimate non-discriminatory basis for discharge.

In addition, Plaintiff could not illustrate that Defendant's reason for termination was pretextual.  If the prima facie case was established, Plaintiff would have to prove by a preponderance of the evidence that Defendant's explanation for Plaintiff's termination was pretextual in order to avoid summary judgment.  Williams, 871 F.2d at 456. "To survive summary judgment, the plaintiff must show that the defendant's non-discriminatory explanation is 'unworthy of credence' or offer 'other forms of circumstantial evidence sufficiently probative' of discrimination or

14

retaliation." <u>Kess v. Municipal Employees Credit Union of Baltimore, Inc.</u>, 319 F. Supp.2d 637, 644 (D. Md. 2004) (quoting <u>Mereish v. Walker,</u> 359 F.3d 330, 336 (4th Cir. 2004)).  For the reasons previously discussed, Plaintiff has failed to show that Defendant's explanation for termination is not credible, nor has Plaintiff offered other circumstantial evidence illustrating discrimination.[6]

**IV.  CONCLUSION**

For these reasons, Defendant's motion for summary judgment will be granted.  A separate order consistent with the reasoning of this Memorandum will follow.

                                   /s/

                          William M. Nickerson
                          Senior United States District Judge

Dated: November 10, 2005

---

[6] Plaintiff argues that Defendant terminated him as a scapegoat in order to satisfy the public outcry over the lead-in-water crisis. Dixit Dep. 139-140.  Even if this is an accurate statement it fails to show discrimination.  Defendant is entitled to make its own business judgments and "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369, 377 (4th Cir. 1995).

Further, when seeking new employment with the County Board of Education Plaintiff stated that he was "terminated as a 'Fall Guy' for much publicized lead in water issues." Dixit Dep. 138-141, Ex. 29.  While disclaiming responsibility for the mishandling of the lead-in-water problems, not until this suit did Plaintiff suggest that he was terminated for discriminatory reasons.  Dixit Dep., Ex. 29